

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

RB:TK
F.#2006R01933

*271 Cadman Plaza East*
*Brooklyn, New York  11201*

October 12, 2010

By ECF and Hand

The Honorable Nina Gershon
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:  United States v. Gary Bogle
           Criminal Docket No. 09 Cr. 68 (NG)

Dear Judge Gershon:

     The defendant in the above-referenced case is scheduled to be sentenced on October 22, 2010.  On May 27, 2009, following a jury trial, the defendant was convicted of Counts 1 and 3 of an indictment charging him with being a felon in possession of a firearm and possessing body armor, having previously been convicted of a crime of violence, in violation of Title 18, United States Code, Sections 922(g)(1) and 931(a), respectively. The Presentence Investigation Report ("PSR") indicates that the defendant's Guidelines range results in a total adjusted offense level of 33 and a criminal history category of V, with a corresponding range of imprisonment of 210 to 262 months.  PSR ¶ 112.  The government agrees with the PSR's Guidelines calculation and respectfully submits this letter in opposition to the defendant's letter dated July 20, 2010 ("Def. Letter"), asking the Court to issue a non-Guidelines sentence and objecting to the PSR's determination that the defendant should be sentenced as an armed career criminal pursuant to Title 18, United States Code § 924(e)(1).  For the reasons stated below, the defendant must be treated as an armed career criminal and should also be sentenced at the upper-end of the Guidelines range.

I.    Factual Background

     On October 3, 2006, at approximately 2:00 p.m., New York City Police Department ("NYPD") Lieutenant Joel Malamed, while driving in Bushwick, Brooklyn, received a radio transmission that a male had been shot approximately two blocks

from where he was located at the time.  PSR ¶ 4.  While Lieutenant Malamed was en route to the scene of the shooting, a light blue Jaguar passed him at a high rate of speed, crossed a double-yellow line and veered into oncoming traffic, nearly striking a woman pushing a baby carriage.  Id.  Lieutenant Malamed then observed the Jaguar slow as it approached the scene of the shooting, at which point he observed the driver of the Jaguar, later identified as the defendant, crouch down in his seat and look toward the scene of the shooting, where police and emergency personnel had gathered.

After initiating a car stop, Lieutenant Malamed ordered the defendant out of his vehicle and several other officers soon arrived to assist the lieutenant.  As one of the officers conducted a pat-down search of the defendant, he noticed that the defendant was wearing a bullet-proof vest under his clothing.  PSR ¶ 5.  A later search of the interior of the defendant's vehicle revealed the presence of electric wiring that was indicative of the installation of a secret compartment, or "trap."  Accordingly, the police continued to search the Jaguar until a "trap" was discovered inside the rear of the front passenger seat.  Inside the hidden compartment, officers discovered a fully-loaded .9mm semi-automatic pistol (with one bullet in the chamber ready to fire) as well as an additional fully-loaded firearm magazine.  PSR ¶ 5.  At least one of the magazines was a large-capacity magazine, capable of holding seventeen bullets.  PSR ¶ 7.

At trial, the government presented numerous witnesses in addition to the officers that stopped and arrested the defendant.  One such witness was the individual who installed the hidden compart in the defendant's vehicle at the defendant's behest.  PSR ¶ 5.  Another was a NYPD detective who testified that the gun recovered from the defendant's vehicle was fully operational and capable of firing a projectile.  PSR ¶ 7.  In addition, the government played a recording of a phone call that the defendant made from prison to his niece, Shaquana Harmon.  PSR ¶ 10.  Harmon was to be called as a witness a trial to explain that even though the Jaguar was registered in her name, the car actually belonged to the defendant.  During this call, the defendant instructed Harmon not to come to court and testify against him.  Id.  Despite the defendant's attempt to influence her decision to testify, Harmon nevertheless appeared at trial and testified that the Jaguar belonged to the defendant.  Following trial, the jury found that the defendant had possessed the firearm and ammunition found in the hidden compartment, as well as the bullet-proof vest he was wearing when arrested.

3

II. Discussion

    A.   The Defendant is an Armed Career Criminal

According to 18 U.S.C. § 924(e)(1), a fifteen-year mandatory minimum sentence must be applied when an individual is convicted of violating 18 U.S.C. § 922(g) and has three previous convictions for a violent felony or serious drug offense. A "violent felony" is defined in § 924(e)(2)(B) as "any crime punishable by imprisonment for a term exceeding one year . . . that (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or (ii) is burglary, arson, or extortion, or involves the use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." Here, at the time the defendant committed the instant offenses, he had already been convicted of three violent felonies.

Pursuant to an arrest that took place on February 20, 1985, the defendant was convicted of Assault in the 2nd Degree, pursuant to NYPL § 120.05(2), in Kings County, New York on September 15, 1986. An individual is guilty of NYPL § 120.05(2) when "[w]ith intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument." Because an element of that offense involves the use of force against the person of another, it qualifies as a violent felony. See United States v. Walker, 442 F.3d 787, 789 (2d Cir. 2006) ("[w]e hold that attempted assault under New York Penal Law § 120.05(2) is a violent felony under the ACCA.").

Pursuant to an arrest that took place on July 12, 1986, the defendant was convicted of Attempted Robbery in the 2nd Degree, pursuant to NYPL § 110-160.10(1), in Kings County, New York on September 15, 1986. An individual is guilty of NYPL § 160.10(1) when "he forcibly steals property and when he is aided by another person actually present." Because an element of that offense also involves the use or attempted use of force against the person of another, it too qualifies as a violent felony.[1]

---

[1] Despite the fact that the defendant was given concurrent sentences for the above offenses, they nevertheless count as two separate offenses for purposes of 18 U.S.C. § 924(e). The statute itself states only that the violent felonies must have been "committed on occasions different from another." Here, the two offenses were committed on separate days. PSR ¶¶ 44, 50.

4

Lastly, pursuant to an arrest that took place on September 16, 1994, the defendant was convicted of Assault in the 2nd Degree, pursuant to NYPL § 120.05(1), in Kings County, New York on February 28, 1996. An individual is guilty of NYPL § 120.05(1) when "with intent to cause serious physical injury to another person, he causes such injury to such person or to a third person." Because an element of that offense involves the use of force against the person of another, it too qualifies as a violent felony.

In light of these three convictions, the Court must sentence the defendant as a armed career criminal and impose a fifteen-year mandatory minimum sentence.

B.  A Sentence at the Upper-End of the Guidelines Range is Appropriate

i) The Defendant's Criminal History

Looking at the instant offenses in light of the defendant's past conduct, it is clear that only a severe sentence will "afford adequate deterrence" and "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(B), (C). Over the past 20 years, the defendant has solidified his status as a habitual offender with a high risk of engaging in dangerous criminal conduct. The defendant's criminal record is littered with horrifying incidents that demonstrate his disregard for the law and human life.

In 1993, the defendant shot two individuals in a drive-by shooting, killing one and critically injuring the other. PSR ¶¶ 55-56. He served over six years in prison for those offenses, which were committed a little more than one year after the defendant was released from custody after serving a significant sentence for assault and drug-dealing. PSR ¶¶ 44-50. In addition, the defendant was convicted for robbery on two other occasions. PSR ¶¶ 41-50. Also disturbing is the defendant's prison disciplinary record. While in custody, the defendant was caught with a weapon on three occasions, assaulted individuals on three occasions (including once with a "shank"), participated in

---

Courts have similarly interpreted the statue this way. See United States v. Samuels, 970 F.2d 1312, 1315 (4th Cir. 1992) ("Nothing in § 924(e) or the Guidelines suggests that offenses must be tried or sentenced separately in order to be counted as separate predicate offenses . . . . The only requirement is that the predicate offenses be 'committed on occasions different from one another'.").

5

a "hostage situation," and, perhaps most troubling, spit feces on a corrections officer. PSR ¶¶ 51, 58.

Considering that, after all of those interactions with the justice system as well as years spent in custody, the defendant chose to install a hidden compartment in his vehicle, arm himself to the hilt, put on a bullet proof vest and drive through a crowded area in the middle of the day, it is clear that the chance of the defendant recidivating is high and that he poses a grave risk to society if not in custody. The defendant has demonstrated that even lengthy jail sentences do not impact his decision-making and that he has no qualms about engaging in behavior that places the public at risk.

### ii) The Serious Nature of the Instant Offenses

The crimes for which the defendant was convicted were of the most serious order. The circumstances surrounding the defendant's arrest lead to the inescapable conclusion that he was preparing himself for a shootout when he was pulled over. The evidence also shows that the defendant painstakingly planned his acts in advance: He placed his clothing over a bullet proof vest, loaded his firearm, brought extra ammunition and ensured that the weapons were not in view. While most individuals try their hardest to distance themselves from a shooting, the defendant sped as fast he could *toward* the shooting, only slowing his vehicle after he witnessed its aftermath and saw police and emergency personnel on the scene. It appears clear that he was seeking out conflict and intended to be a participant in a violent altercation. Disturbingly, this shootout would have taken place in a busy commercial area in the middle of the day. Considering that the defendant's objective was to seriously injure or take the life of another – in a manner that would have risked the lives of countless innocent people – the Court should consider the instant offenses as most serious and sentence the defendant accordingly.

6

III. <u>Conclusion</u>

      For the reasons stated above, a period of incarceration at the upper-end of the Guidelines range is appropriate.

      Respectfully submitted,

      LORETTA E. LYNCH
      United States Attorney


By:     /s/    
    Todd Kaminsky
    Assistant U.S. Attorney
    (718) 254-6367

cc:  Barry Krinsky, Esq.
    Michael Dorra, U.S. Probation